JOHN D. MUNDING
CRUMB & MUNDING, P.S.
111 S. Post Street, PH 2290
Spokane, WA 99201
(509) 624-6464
munding@crumb-munding.com

Attorney for Debtor in Possession.

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **In re** | Case No. 10-04024-FLK 11 |
| **CENTURION PROPERTIES III,** | Chapter 11 |
| **LLC,** | **MEMORANDUM IN SUPPORT OF INTERIM ORDER AUTHORIZING:** |
| **Debtor.** | **1) MODIFICATION/SUSPENSION OF "LOCKBOX" PAYMENTS** |
| | **2) UTILIZATION OF CASH COLLATERAL** |
| | **3) GRANTING ADEQUATE PROTECTION** |

Centurion Properties III, LLC, the Debtor-in-Possession, in the above captioned case (the "Debtor" or "CPIII") hereby moves for entry of an interim order (the "Interim Order") under sections 105, 361, and 363 of Title 11 of the United States

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules for the United States Bankruptcy Court for the Eastern District of Washington (the "Local Rules"), (1) Releasing funds held in Lockbox; (2) Use of Cash Collateral on an Interim Basis; and (3) A Determination of Interim Adequate Assurance Payments (as defined below). Pursuant to Local Rule 4001(2)(a)(1)(B), the Debtor requests an immediate hearing on shortened time authorizing the use of cash collateral on an interim basis pending final hearing.

As described in the Declaration of Michael E. Henry and as detailed below, the suspension of "Lockbox" payments and direct utilization of cash collateral is necessary to stabilize the Debtor's commercial property operations (the Battelle Property) and to preserve performance and lease obligations, carry out managerial duties, and complete Task Order (Tenant Improvements) performance. The restricted use of cash collateral as outlined below will guarantee preservation of the Debtor's real property holdings valued in excess of $90 million and preserve jobs at a local level. The use of cash collateral will not be prejudicial to secured creditors and will insure the Debtor's ability to commence this reorganization in the best possible way to maximize the value of its holdings for the benefit of all creditors, including General Electrical Capital Corporation ("GECC").

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

# I.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

# II.    PROCEDURAL POSTURE

On July 9, 2010 (the "Petition Date"), Debtor filed its voluntary Petition for relief under Chapter 11 of the United States Code, 11 U.S. C. §§ 101 et seq., as amended (the "Bankruptcy Code"). The case is referenced by Case Number 10-04024. The Debtor continues to operate its business and, through a management contract with Sigma Management, Inc., manages its property as Debtor-in-Possession pursuant to sections 1107(a) and 1008 of the Bankruptcy Code.

As of the date of this Memorandum, no creditors committee has been appointed in this Chapter 11 case by the United States Trustee. No Trustee or Examiner has been appointed in this Chapter 11 case.

# III.    FACTUAL BACKGROUND

## A.    The Debtor.

The Debtor is a Washington Limited Liability Company formed by its members on August 1, 2006. The sole purpose of the Debtor was and is "the acquisition,

**CRUMB & MUNDING, P.S.**
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

ownership, operation and management of the real estate project known as the Battelle Leaseholds located in Richland, Washington, and such activities are necessary, incidental or appropriate in connection therewith." The Debtor's sole asset is its leasehold interests in the Battelle Memorial Institute Campus ("Battelle Property") and the improvements (i.e. the buildings) located thereof which, collectively, have been valued in excess of $90 million.

As of September 25, 2009, the Debtor's business records reflected ownership interest of the Company to be held as follows:

| Members/Holders of Percentage Interests in Company | Percentage Interests |
|---|---|
| Nicole M. Kelly | 10% |
| Centurion Management III, LLC | 63% |
| SMI Group XIV, LLC | 25% |
| Barclays North, Inc. | 1% |
| Patrick L. McCourt | 1% |

The foregoing ownership is verified by a company document identified as "First Amendment to the Limited Liability Company Agreement" dated September 25, 2009. This governance is recognized and supported by Benton County Superior Court Order dated May 28, 2010. (Decl. J. Munding.) Additionally, in accordance with Benton County Superior Court Order of February 12, 2010, Barclays North, Inc. and

MEMORANDUM IN SUPPORT OF INTERIM ORDER- 4

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

Patrick L. McCourt's interests was transferred to SMI Group XIV, LLC ("SMI"), resulting in SMI obtaining a 27 percent interest in CPIII.

Even though Centurion Management III, LLC ("CM III") and Nicole M. Kelly are on record as holding ownership interests in CP III, it is the position of CP III that their membership status (i.e. their ability to vote and control CP III's business affairs, but not necessarily their base economic interest) has been terminated as a result of their voluntary withdrawal from CP III, transfers of membership interest in violation of the Company Agreement, and complete disregard for the Company Agreement in breach of the fiduciary obligations to CP III by fellow members. As a result, the only qualified and recognized Member, for purposes of governance and business administration, is SMI.

As previously mentioned, this governance is recognized and supported by Benton County Superior Court Order dated May 28, 2010. (Decl. J. Munding.)


1.    Managing Member of LLC

Pursuant to its governing company agreements, the Debtor is managed by a "Managing Member." The Managing Member of the Debtor is different than the property manager hired by the Debtor to manage the Battelle Property. As described below, the actual Battelle Property Manager is Sigma Management, Inc.

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

The Managing Member of the Debtor, for purposes of management and governance of the Debtor, initially was CM III, the Debtor's majority interest holder. CM III was operated variously under the direction of Aaron Hazelrigg and/or Thomas Hazelrigg III.

On September 24, 2009, by Company Resolution, CM III was replaced by SMI as Managing Member. SMI's role as Managing Member was confirmed both by Aaron and Tom Hazelrigg, and more recently by the Benton County Superior Court by Court Order dated May 28, 2010. (*See* Decl. M. Henry)

The Debtor is presently managed by its sole managing member, SMI Group XIV, LLC and governed by the Limited Liability Company Agreement dated August 1, 2006 as amended by subsequent documents dated September 24 and September 25, 2009. (*See* Decl. M. Henry)

## B.    The Battelle Property.

The Battelle Property consists of five buildings, related improvements and common areas located on the Battelle Property. (*See* Decl. M. Henry) Four of the buildings comprising of the Battelle Property are used as Class A office space and computer server/data centers. (*Id.*) The fifth building is an 84-bed facility for

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

residential housing, used by the tenant to accommodate both short and long term stay on the campus. (*Id.*)

Originally, the Battelle Property was bare ground and was leased to Sigma Financial Group VI - X, L.P.(s) ("Sigma Financial") under five separate, long-term ground leases set to expire between September 30, 2051 and September 30, 2060. Sigma Financial then built buildings and related improvements on the land, even though it did not own the land. After completion of the buildings and improvements, Sigma Financial leased those buildings and improvements back to Battelle through five separate shorter term facilities leases (the "Facilities Leases"). Accordingly, Battelle is both the Ground Landlord and the Facilities Tenant for each of the five buildings. (*See* Decl. M. Henry)

Under the Ground Leases, the ground tenant pays Battelle ground rent. Under the Facilities Leases, Battelle pays its landlord (i.e., the ground tenant) a Base Rent amount, and also a "Service Rent" which includes all actual, documented and approved expenses incurred in connection with each portion of the property, including management, fees, maintenance, etc. (*See* Decl. M. Henry)

The original Base Rent was established in the Facility Lease for each facility and the current Base Rent was established in Lease Supplements for each facility. (*See* Decl. M. Henry) The following is a listing of the Facility Lease Agreement Numbers

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

for each of the facilities and the corresponding Lease Agreement Numbers for each of the facilities, the corresponding Lease Supplements that established the current Base Rent rate, along with extension of the lease terms for each facility to the current lease end date:

ISB I – LEASE AGREEMENT NO. 052241-C-N2 – Lease Supplement No. 19

ISB II – LEASE AGREEMENT NO. 146541-D-N2 – Lease Supplement No. 19

NSB – LEASE AGREEMENT NO. 169833-D-N2 – Lease Supplement No. 23

ETB – LEASE AGREEMENT NO. 248370-D-N2 – Lease Supplement No. 16

UHF – LEASE AGREEMENT NO. 430410-D-N2 – Lease Supplement No. 10

The Chart below depicts the breakdown of Ground Rent between the facilities.

| Building | Physical Address | Designation | Former Designation | Tenant | Square Feet | Lease End Date | Monthly NNN Base Rent | Annual Base Rate/sf |
|---|---|---|---|---|---|---|---|---|
| Information Sciences Building I | 3350 Q. Avenue, Richland, WA | ISB I | SIGMA VI | Battelle | 50,200 | 30-Sep-17 | $82,620.83 | $19.75 |
| Information Sciences Building II | 3320 Q. Avenue, Richland, WA | ISB II | SIGMA VII | Battelle | 60,080 | 30-Sep-17 | $98,881.67 | $19.75 |
| National Security Building | 3230 Q. Avenue, Richland, WA | NSB | SIGMA VIII | Battelle | 100,358 | 30-Sep-18 | $172,699.39 | $20.65 |
| Environmental Technology Building | 3200 Q. Avenue, Richland, WA | ETB | SIGMA IX | Battelle | 100,358 | 30-Sep-18 | $172,699.39 | $20.65 |
| User Housing Facility | 620 Battelle Blvd., Richland, WA | UHF | SIGMA X | Battelle | 29,108 | 30-Sep-18 | $29,108.00 | $12.00 |
| | | Total Square Feet | | | 340,104 | | | |

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

The monthly base rent on the property totals approximately $556,009.28.

### C.    Management by Sigma.

Sigma Financial entered into a new Management Agreement with Sigma Management, Inc. ("Sigma"), on December 17, 2001 (Sigma Management provided project management services for the original construction of all five facilities and has managed the property ever since.    Pursuant to the terms of the Management Agreement, and Management Agreement Supplement of October 1, 2005, Sigma is the exclusive manager of the Battelle Property and provides complete operational services as well as all lease negotiations, accounting, recordkeeping and administrational requirements.  In addition to Ground Rent, Battelle pays all the actual operating expenses for the operation of the facilities through a Service Rate.  The Service Rate is paid by Battelle on a monthly basis as "Service Rent," as per the terms established in the Facility Lease Agreements, and as revised in the Lease Supplements (listed above).  The Service Rate is not revenue for the Debtor.  100 percent of the monies paid by Battelle through the Service Rate are for the operation of the facilities. Components of the Service Rate include Utilities, Maintenance, Taxes, Insurance, Ground Rent, and Management Fees, including administrative overhead. Management Fees on costs falling under Service Rate are negotiated and approved by

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA  99201
(509) 624-6464
FAX (509) 624-6155

Battelle and contractually established and defined in the Facility Lease Agreements and Supplements thereto, at 4.6 percent of gross rent; the entire Management Fee is paid to Sigma, CP III is merely a conduit for those fees and the other operating expenses and has no claim or rights in the Service Rent.

Monthly Service Rate budgets are established yearly through negotiation with Battelle. (*See* Decl. M. Henry)  After conclusion of the Service Rate year for each facility, actual costs for the operation of the facilities through the Service Rate year are compared to the established budget for the same time period. (*Id.*).  To adjust for any difference between the negotiated budget amount and actual expenses, a reconciliation payment is received from or a reconciliation credit is provided to Battelle. (*Id.*)  Projecting our for the balance of this calendar year, actual operating expenses will likely exceed the Service Rate budged and CP III will be required to extend funds and receive a reconciliation payment.  This is the contractual arrangement under the Facility Leases Agreements, but CP III will be unable to perform as required unless the Court suspends GECC's lock box.

In 2006, Sigma Financial decided to sell its interests in the Battelle Property. (*See* Decl. M. Henry)  SMI entered into an agreement to purchase the Original Ground Tenant's interest in the Battelle Property, its leasehold interests as Ground

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

Tenant under the Ground Leases, and interests as the owner of the buildings and improvements located on the land. (*See* Decl. M. Henry)

SMI entered into negotiations with General Electric Capital Corporation ("GECC") as a potential lender for the purchase of the Battelle Property Ground Tenant interests. (*See* Decl. M. Henry)   As GECC required SMI to find additional investors, SMI associated with Thomas R. Hazelrigg III in 2006.  On August 1, 2006, the newly created investment group formed the Debtor to complete financing with GECC and hold ownership of the Battelle Property.

When the Debtor purchased Sigma Financial's interest in the Battelle Property, it reaffirmed the original Management Agreement and Management Agreement Supplement with Sigma. (*See* Decl. M. Henry)  Sigma maintains the long term service and management contracts with the Debtor.


**D.    GECC Financing.**

On November 8, 2006, the newly formed Debtor entered into a Loan Agreement with GECC.  The Loan Agreement (the "Loan") for $70,866,000.00 is secured, among other things, by a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (Leasehold Estates) dated November 28, 2006, and recorded November 29, 2006, in the Official Records of Benton County,

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA  99201
(509) 624-6464
FAX (509) 624-6155

Washington as Document No. 2006-039335. (*See* Decl. M. Henry.) The Deed of Trust encumbers the Property. (*See* Decl. M. Henry.)

Pursuant to the terms of the loan, the Debtor was required to make monthly payments based upon an interest rate of 6.36 percent which is roughly $330,00.00 per month. The loan matured by its terms on November 30, 2009. The Debtor did not repay the loan on November 30, 2009. GECC continues to receive monthly payments under the "Lockbox" Agreement of approximately $556,009.28 per month. As of the date of the Petition, the balance owed to GECC is believed to be approximately $58,250,000.00.

### E.    GECC Lockbox/Default/Trustee Sale.

On September 23, 2008, GECC served a Default Notice on the Debtor. At that time GECC drew up a proposed hard lockbox agreement. Although Sigma argued that the Service Rate and Task Order Payments should not be paid into the Lockbox, since those funds were Battelle's money and CP III was merely acting as a payment conduit, the lockbox agreement was still signed by Aaron Hazelrigg on behalf of CP III. Since October, 2008, GECC has been collecting all monies paid by Battelle in payment for all of CP III facilities for Base Rent, Service Rent, and Task Orders. Pursuant to the terms of the lockbox agreement, GECC, in its sole discretion and upon

**CRUMB & MUNDING, P.S.**
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA  99201
(509) 624-6464
FAX (509) 624-6155

proper application, has the ability to disburse the Service Rate and Task Order income to CP III and Sigma. (*See* Decl. M. Henry.) On or about the 14th and 29th or 30th day of each month, the property manager, Sigma, has been required to submit, via e-mail to the GECC asset manager Sebastian Perin, disbursement amounts, summary of expenses by category, and documentation by invoice copies for expenses under Service Rate. Also submitted in this process for disbursement is a summary of Task Order payments made by Battelle into the Lockbox. Task Orders are listed by Task order number and building, along with the amounts and dates of deposit into the Lockbox by Battelle. A Battelle Transaction Summary is included in the e-mail submission as well, which details the Lockbox balance after the most recent previous disbursement, GECCMSA payments, Task Order income, Rental income, and proposed disbursement amounts for operating expenses (Service Rent) and Task Orders.

GECC requires that management and service payments owed to Sigma also be deposited into the lockbox agreement. As previously stated, Sigma had managed the property for the prior predecessor-in-interest of the Battelle Property, Sigma Financial, since original construction and been the project manager for all five buildings. When CP III purchased Sigma Financial's interests in the Battelle Property it reaffirmed the original Management Agreement with Sigma. (*See* Decl. M. Henry.)

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

As a condition of making the loan, CP III, as owner, and Sigma, as manager were both required to enter into a Subordination of Management Agreement dated November 28, 2006. (*See* Decl. M. Henry.) That subordination agreement, in pertinent part, contained the following General subordination language:

> The owner shall not pay to the Manager any fees or other sums due to the Manager under any Management Agreement . . . if a monetary Event of Default has occurred and is continuing.

The General subordination contains the following limitation:

> Notwithstanding anything to the contrary herein, the payments which Manager may be required to turn over to Lender under this section will be limited to payment for services only, and not include any reimbursement or payment of expenses incurred, which amounts Manager will be permitted to retain and pay over.

There is no dispute that a monetary event of default has occurred. However, since the default, GECC required CP III to turn over all Service Rate and Task Order Income. Sigma has a contractual agreement with CP III to provide management services to the Battelle Property. Sigma's original Management Agreements commenced concurrent with the commencement of the facility Lease Agreements. The Management Agreements include the management of all Task Orders (Tenant Improvements) conducted in the facilities, contracted for services worth several hundred thousand dollars of additional Task Order Work. Sigma, through its own employees and independent contractors, supplies complete operational services for the

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

Battelle Properties. GECC requires that management and services payments owed to Sigma be deposited into the Lockbox Agreement.

The current total monthly Base Rent amount paid by Battelle for all CP III facilities combined is $556,009.28. (*See* Decl. M. Henry.) Base Rent is the amount Battelle pays to occupy the CP III facilities and is commonly known in the commercial real-estate industry as NNN rent.

GECC posted a default notice on the subject property and CP3 on January 8, 2010 as a first step in foreclosing their deed of trust. On February 11, 2010 GECC filed a Complaint in Benton County Superior Court, Case No.10-2-00372-7 against the Debtor seeking appointment of a receiver. After continued negotiations with GECC, the Debtor was able to avoid the appointment of a Receiver, continue the pending Trustee's Sale, and continue with negotiations for forbearance of the loan.

## IV. DISPUTED SECURED LOAN / LIGITATION

Almost immediately upon closing and funding of the GECC loan, Thomas Hazelrigg, through the then managing member CM III, and to the detriment of the company, began to orchestrate a series of ultra vires transactions for his own personal financial gain. In one instance, Thomas Hazelrigg directed the sum of $2.1 million for closing proceeds of the GECC loan to his bank accounts under his control. On

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

another occasion, Thomas Hazelrigg directed the sum of $3.22 million for a GECC funding release to bank accounts under his control. The actions of Mr. Hazelrigg deprived the Debtor of much needed cash, causing significant and irreparable harm to the Debtor's financial future. Furthermore, at the time of the GECC loan, acting manager CM III, through its representative Aaron Hazelrigg, confirmed that in consideration of the acquisition loan, both the GECC Loan Agreements and governing company agreements would provide for restrictive language preventing the Debtor from further encumbering the property without proper unanimous consent. (*See* Decl. M. Henry.)

Despite knowledge of the prohibitions against further encumbrance of the Debtor's property, Aaron and Thomas Hazelrigg, through manipulation of managing member CM III and in conjunction with Equity Funding, LLC, Centrum Financial Services and Trident Investments, Inc., placed a total of five deeds of trust against the property, including:

(1) a leasehold deed of trust signed by Aaron, for the benefit of CFS recorded on July 10, 2007, which purposed to secure a loan from Centrum to CP III for $10 million in principal made between February and July 2007, CP III never received any such loan, it is not in the Company's books.

Memorandum In Support Of Interim Order- 16

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

10-04024-FLK11    Doc 6    Filed 07/13/10    Entered 07/13/10 16:11:44    Pg 16 of 29

(2) a leasehold deed of trust signed by Hazelrigg for the benefit of CFS recorded on March 5, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP III allegedly gave on March 5, 2008 to benefit CFS – no amount is stated in this deed of trust.

(3) a leasehold deed of trust signed by Hazelrigg for the benefit of Equity Funding recorded on April 7, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP II allegedly gave to benefit Equity Funding – no amount is stated in this deed of trust.

(4) a leasehold Deed of Trust signed by Hazelrigg for the benefit of Trident recorded on November 5, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP III allegedly gave to benefit Trident – no amount is stated in this deed of trust.

(5) a Memorandum of Agreement signed by Derek Edmonds, listing CP III as grantor and Trident as grantee recorded November 6, 2008, and describing an underlying agreement whereby all "net sums" that would otherwise be paid to CP III in connection with the sale of the Subject Property were to be paid by giving CP III certain undefined "notes receivable."

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

The Debtor's company records indicate that such transactions were never authorized and were not ratified by the Debtor, its members or its managers. These were ultra vires acts.

Upon learning of the improper and illegal activities and in conjunction with the default of the GECC loan obligation, SMI, as manager of the Debtor, commenced litigation in Benton County Superior Court, State of Washington, identified by Case Number 10-00301-8. (*See* Decl. J. Munding.) The case proceeded along parallel tracks with the receivership litigation commenced by GECC which is identified by Case No. 10-2-00372-7.

## V.    COURT ENJOINS EQUITY FUNDING, CENTRUM FINANCIAL AND GECC FROM FORECLOSING ON DEBTOR'S PROPERTY

On February 19, 2010, in the Benton County matters, the Court granted the Debtor's Motion enjoining Equity Funding and Centrum Financial from foreclosing on their purported deeds of trust. The Benton County Superior Court stated:

> My primary concern and focus then was to figure out whether or not either Thomas Hazelrigg or his son [Aaron] had authority to encumber this property, and I look a the limited liability company agreement that requires the manager has authority to encumber the property but it must be consistent with its business and it must carry out its business.

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

Well, if there's encumbrances [*sic.*] of a company where there's [*sic.*] no monies that are actually paid to the company, I fail to see how that would be consistent with or carry out its business.

I also found that a member consent is required for certain transactions. One would be where there's a conflict of interests, and here the take as you call it, Mr. Bailey, indicates that what Hazelrigg was supposed to do was pay the money into the company as his capital contribution, not to directly acquire the property and then when somebody wants to turn around and use the property that doesn't belong to Hazelrigg as collateral on a loan to the Hazelrigg entities, that would seem to me to be a conflict of interests that clearly wasn't authorized under the limited liability company agreement without the consent of the other members.

*Then just big as life there could not be any liens that were inconsistent or that were non trade loans or any consensual liens against the property without GECC's consent. That's right there in the limited liability company agreement, which the defendant admits that they had.*

*So, they had the document in their hand that tells them that Hazelrigg did not, absolutely did not have the authority to enter into theses transactions.* According to the second amendment to the promissory note, that's dated July 5th of '07, *two other entities, the Centurion Southwest and the Centurion Silver, were the ones who actually borrowed the money back in '06, and that Centurion Properties was simply added as a payee.*

*Id.* (*See* Decl. of J. Munding; Transcript of Verbatim Report of Proceedings at 41:16-43:2) (emphasis added). The Court specifically questioned the Deed of Trust:

Now this deed of trust, accompanied by the seventh promissory note, was signed 14 or 15 months after the alleged loan. It was signed by Thomas Hazelrigg, and *I just find that to be highly suspect.* In my 20 some years as an attorney that did these kinds of transactions, I've never known a lender to wait 15 minutes let alone 15 months to get their deed of trust on a property, especially when we're talking about ten million dollars.

\* \* \*

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

I just think on its face at that time it was really clear what was happening, and anyone with any business acumen at all would understand that they would need to investigate whether or not what Hazelrigg was proposing was legitimate.

Not that that's essential to my ruling, but what *I'm finding is the plaintiffs have an excellent probability at trial of demonstrating that the deed of trust and the promissory notes were simply not authorized and there was no consideration given to them. So, I do believe the injunction should stay in affect.*

*Id.* (Transcript of Verbatim Report of Proceedings at 43:24-44:6, 45:15-46:6) (emphasis added).

Although Equity Funding and Centrum Financial were enjoined from foreclosing, GECC continued with its Trustee's Sale. Subsequently, both Centrum and Equity Funding moved to stay GECC's proposed Trustee's Sale. After briefing and hearing, the Benton County Court stayed GECC's proposed June 25, 2010 Trustee's Sale, until further Order of Court. (*See* Decl. J. Munding.)

Although the pending Trustee's Sale and the Debtor's property have been enjoined, its financial issues have not been solved, necessitating the filing of this bankruptcy proceeding.

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

# V. VALUE OF PROPERTY

On June 9, 2008, the Debtor's leasehold property was appraised at $98,000,000.00 (*See* Decl. M. Henry.) Base Rent for the property generates monthly payments of approximately $556,009.28 (*See* Decl. M. Henry.)

# VI. GECC IS ADEQUATELY PROTECTED

With an appraised value of $98 million and secured indebtedness of $58.25 million, GECC enjoys an equity cushion in the property of approximately $39.75 million. As demonstrated by historical reports, the Debtor has the ability to continue to make original monthly loan payments of approximately $330,000 (interest only at 6.36% on the then outstanding balance) as additional adequate protection. The underlying leases are not in default, all tax obligations are paid, and the Debtor is fully performing management tasks through Sigma for the benefit of the Battelle property.

Pursuant to Section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtor to use Cash Collateral as long as secured creditors are adequately protected. In re Mellor, 734, F.2d 1396, 1400 (9th Cir. 1984). Although adequate protection is not defined in the Bankruptcy Code, Section 361 provides the following three nonexclusive examples of what may constitute adequate protection:

> a. requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the … use… under Section 363

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

of this title ... results in a decrease in the value of such entity's interest in such property

b. providing to such entity an additional or replacement lien to the extent that such ... use... results in a decrease in the value of such entity's interest in such property; or

c. granting such other relief... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361; see also In re Ernst Home Center, Inc., 209 B.R. 955, 966-67 (Bankr. W.D. Wash. 1997. "Adequate protection is not meant to be a guarantee that a creditor will be paid in full. Instead, the Court must determine whether the [creditors'] interests are protected as nearly as possible against the possible risks to that interest." Id., citing In re Mellor, 734 F.2d 1396, 1401 (9th Cir.1984); In re Martin, 761 F.2d 472, 477 (8th Cir.1985); In re McCombs Properties VI, Ltd., 88 B.R. 261, 267 (Bankr.C.D.Cal.1988).

Nowhere in the Bankruptcy Code is "interest in property" defined. However, the statute plainly provides that a qualifying interest demands protection where the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); see also United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365 (1988). Hence, where the value of the collateral is not declining during the pendency of a bankruptcy, or there is an equity cushion in the collateral, the secured creditor's interest is adequately

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

protected. See McCombs Props. VI, Ltd. v. First Texas Sav. Ass'n., 88 B.R. 261, 266-67 (Bankr. C.D. Cal. 1988). Here, the Cash Collateral Lender has an equity cushion far in excess of the amount claimed owed, and are further adequately protected by the fact that the Debtor will also be making monthly adequate assurance payments of $306,917.00. GECC is adequately protected.

## VII. USE OF CASH COLLATERAL CRUCIAL TO PERFORMANCE OF LEASE OBLIGATIONS/PRESERVATION OF VALUE

Under the Battelle leases, Battelle's payments are segregated into three different categories: (1) Base Rent; (2) Service Rate Payments; and (3) Task Order Payments.

The Service Rate Payments (a.k.a. Service Rent) are only those actual operating costs of the facilities which have been approved by Battelle, including a property management fee which Battelle negotiated and incorporated into the Facilities Leases. For example, in the Facilities Leases the ground rent payable back to Battelle, property taxes, insurances, all utilities, HVAC, property management, and the like are included in the Service Rate Payments. Battelle reviews and approves the Service Rates annually and CP III does a year-end "tune up." Although landlord collection and payment of operating expenses is quite common in multi-tenant commercial properties, it is less common with single tenant commercial properties; for single

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

tenant properties, it is much more common for the sole tenant to be responsible for maintaining, insuring and improving the rented premises through its own staff, and even pay the property taxes directly and provide its landlord with proof of timely payment. Regardless, Battelle wanted the Debtor to process and pay these expenses. The Facilities Leases were structured to pass Battelle's funds through the Debtor to pay Battelle's operating expenses.

The Debtor has done this, but efforts are hampered and delayed by the "Lockbox" requirement. The Task Order payments are different than Service Rents. Battelle continuously requests that the Debtor obtain bids and supervise construction of numerous, substantial improvements to the portion of the Battelle campus which includes the Property. At times, monthly Task Order Payments can exceed $1,000,000.00, particularly during the summer construction season. At present Battelle has already paid $47,000.00 in advance in Task Order Payments for work which is already underway or will be performed this summer for which payment obligations to contractors, suppliers and employees are being incurred daily. These Task Orders are invoiced at the conclusion of the work. When this work is invoiced to Battelle by the Debtor, as previously set up, the funds to pay for the work will be remitted by Battelle as Task Order Payment and end up in the GECC Lockbox. At Battelle's request, the Debtor has also submitted proposals for even more Task Order

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

work, which would be reflected in subsequent, additional Task Order Payments of more than $760,000.00. In most commercial leases the landlord approves the Tenant's improvements and the Tenant funds them, although the landlord would require lien free completion. Also, if enough was at risk, the landlord would even require a construction escrow to ensure funds are disbursed and liens prevented. Regardless, the Facilities Leases are structured to shift administration and disbursement function to Debtor property manager (Sigma), rather than to Battelle or neutral escrow.

Notwithstanding objection, Aaron Hazelrigg (signing, in October 2008 as the "Member and Director" of Centurion Properties III, the Debtor's Manager) executed GECC's Lockbox agreement. GECC immediately implemented the Lockbox through Deutsche Bank.

In response to concerns over the diversion of Battelle's funds into GECC's Lockbox, Sebastian Perin, the GECC Asset Manager in charge of the GECC loan, assured the Debtor would set up a process to expedite approval and distribution of the Service Rate Payments and Task Order Payments so there would be no interruption and, accordingly, Battelle would not be disrupted. The parties developed a twice-monthly system whereby Sigma would e-mail GECC the required draw amounts, with documentation and the date that payment was required (frequently 1-2 business days

MEMORANDUM IN SUPPORT OF INTERIM ORDER- 25

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

from the e-mail date), and without exception Sebastian was able to obtain the necessary approvals and have the funds wired within 1 business day of the required date. Until the GECC loan matured, any excess in the Base Rent above the GECC debt service amounts was also promptly wired to the Debtor's bank account. However, starting in December, 2009, GECC elected to retain the excess Base Rent as the GECC loan had matured. This retention of funds placed immediate hardship upon the Debtor. (*See* Decl. M. Henry.)

Following the Court's June 11 .hearing in this case, Sigma prepared the mid-month disbursement request for roughly $350,000.00 in Service Rate and Task Order Payments. As demonstrated by the Declaration of Michael E. Henry, the relationship between GECC, Sigma and the Debtor has become strained and unpredictable. The Service Rent payments and the Task Order payments cannot be recorded as "rents" by GECC and are Battelle's funds administrated by the Debtor. Delay and confusion only serves to impair the Debtor's ability to perform its obligations for Battelle.

1.   Service Rent Reserves Necessitates Use of Cash Collateral. Prior to the November 2009 default, GECC received monthly debt service payments from the Debtor of approximately $330,000. The monthly Base Rent received from Battelle was $556,009.28, leaving an excess of $258,092.28. The sum of $258,092.28 was held in reserve for the purposes of supplementing the Service Rent budget. When the

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

Debtor defaulted on the GECC loan, GECC retained the excess Base Rent to the detriment of the Debtor. The accumulated reserve by GECC during the past six months is in excess of $1,548,553.68. (*See* Decl. M. Henry; Lockbox Summary.)

The reserve previously set aside by the Debtor each month was and remains critical to sustain operations, management, and the maintenance of the Battelle Properties.

2. <u>Projected Cash Flow Needs</u>. In addition to actual Service Rents and Task Order actual pass through amounts, the Debtor requires the difference in Base Rent for its reserve account as set forth above. In addition, the Debtor anticipates the following additional administrative expenses:

- Attorney's Fees for General Chapter 11 Administration of $20,000 per month
- Attorney's Fees for anticipated litigation of $25,000 per month
- Bookkeeping, accounting, forensic accounting, document preparation, records necessary, consumables of about $15,300 average per month

(*See* Decl. M. Henry.)

Based upon the foregoing, the Debtor respectfully requests the excess Base Rent in excess of the proposed adequate assurance payment of $258,092.28 be turned

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155

over to the Debtor to be placed in a reserve fund for the Service Rent deficiencies and administrative expenses.

## VII.  RELEASE, USE AND REPORTING

### A.    Release of Cash Collateral.

The Debtor requests the immediate release of any and all payments held within the "Lockbox," with the exception of interest payments at the non-default rate of 6.36%.

### B.    Base Rents.

On an ongoing basis, the Debtor requests that only Base Rents be deposited into the "Lockbox."  From the Base Rent deposit, the non-default interest shall be distributed each month to GECC.  Remaining Base Rents of shall be disbursed to the Debtor.

### C.    Service Rents.

All Service Rents are proposed to be directly invoiced to Battelle and paid by the Debtor outside of the "Lockbox."  The Debtor shall account for all service rents invoiced and paid on a bi-monthly basis.

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA  99201
(509) 624-6464
FAX (509) 624-6155

**D. Task Orders.**

All Task Orders shall be billed directly to Battelle and payment remitted directly to the Debtor outside of the Lockbox. The Debtor shall report twice monthly to GECC of all Task Order invoices and payments.

**E. Reporting.**

The Debtor shall provide GECC a detailed accounting of all rents received and all expenditures on a bi-monthly basis, pending final hearing.

WHEREFORE, the Debtor respectfully requests that the Court enter the proposed Interim Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

DATED this 13th day of July, 2010.

CRUMB & MUNDING, P.S.

_____
JOHN D. MUNDING, WSBA #21734
Attorneys for Centurion Properties III, LLC

p:\files\centurion prop\2010.021

CRUMB & MUNDING, P.S.
THE DAVENPORT TOWER
111 S. POST STREET, PH 2290
SPOKANE, WA 99201
(509) 624-6464
FAX (509) 624-6155